# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SARKIS' CAFE, INC., an Illinois corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SARKS IN THE PARK, LLC, an Illinois ) <br> limited liability company, ) <br> ) <br> Defendant. ) <br>  ) <br> ) <br> SARKS IN THE PARK, LLC, an Illinois ) <br> limited liability company, ) <br> ) <br> Third-Party Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DANIEL K. GALLAGHER and ) <br> SCOTT N. JAFFE, both individuals, ) <br> ) <br> Third-Party Defendants. ) | Case No. 12 C 9686 <br><br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarkis Café, Inc., filed suit against Defendant Sarks in the Park, LLC, for trademark infringement and other alleged violations of the Lanham Act and state law. The parties have filed cross motions for summary judgment. For the reasons stated below, Plaintiff's motion [183] and Defendant's motion [190] are granted in part and denied in part.

## Factual Background

In 1965, Sarkis Tashjian opened "Sarkis Café," a restaurant in Evanston, Illinois, which became known for serving breakfast sandwiches such as the "Loretta" and the "Disaster." Pl.'s LR 56.1 Stmt. ¶ 4, ECF No. 185. In 2001, Tashjian sold the restaurant to Plaintiff Sarkis Café,

Inc., which still owns it today. *See id.*[1] Jeff and Marla Cramin are its sole owners. *See id.* ¶ 7. Although initially the restaurant was managed by Jeff, after he passed away in 2002, Scott Jaffe, Marla's brother, became Sarkis Café's manager. *See id.* ¶ 8.

In 2009, Jaffe began talking to Josh Alomia and Daniel Gallagher about the possibility of opening a "sister restaurant" in Lincoln Park, a neighborhood in Chicago approximately 10 miles from Sarkis Café. *See id.* ¶¶ 9–10. Based on these conversations, Alomia and Gallagher formed Defendant Sarks in the Park, LLC and asked Jaffe to draft a franchising agreement so that Defendant could obtain a lease. *See id.* ¶ 11; *See* Def.'s Answer, Countercl. & 3rd Party Compl. at 17, ECF No. 139 ("Answer").

In response Jaffe prepared a document outlining the basics of a potential franchise relationship between the two entities; among other things, the proposed agreement permitted Defendant to use Plaintiff's trademarks. Pl.'s LR 56.1 Stmt. ¶ 11; Franchising Agreement, Marla Aff., Ex. 2, Pl.'s LR 56.1 Stmt., Ex. A. The document included two signature blocks, one for Plaintiff and one for Defendant. *See* Franchising Agreement. Although the copy of the agreement submitted to the Court bears the signatures of both parties, Plaintiff contends that neither Jaffe nor Marla signed the document—a fact that Defendant does not dispute. *See* Pl.'s LR 56.1 Stmt. ¶ 11.

At some point during the negotiations between Defendant and Jaffe, Defendant sent its employees to Sarkis Café to learn how to make certain menu items. Def.'s Stmt. Additional Facts ¶ 23, ECF No. 191.

---

[1] Defendant challenges the notion that Plaintiff became the owner of the restaurant and the trademarks in 2001. Def.'s Resp. LR 56.1 ¶ 4, ECF No. 191. Because the agreement memorializing the sale lists "CAFÉ SARKIS, INC., an Illinois Corporation to be formed," as the recipient of the business, Defendant argues that it is this third-party that actually owns the restaurant. Def.'s Stmt. Additional Facts ¶ 1, ECF No. 191. This fact is disputed.

2

In July 2009, Marla discovered for the first time that Jaffe was negotiating a franchise agreement with Defendant, and she contacted Alomia to tell him that she did not want to open a "sister restaurant." *See* Pl.'s LR 56.1 Stmt. ¶¶ 12, 14.[2] Nonetheless, Defendant opened its restaurant in Lincoln Park on or around July 17, 2009, calling it "Sarks in the Park." The restaurant featured sandwiches such as the "Loretta," the "Disaster," and the "Animal." *See id.* ¶ 16. Based in part on statements by Jaffe to the press, the new restaurant received news coverage that described Defendant's restaurant as a franchise of Sarkis Café. *See* Def.'s Stmt. Additional Facts ¶ 27.

After Defendant's restaurant opened, Marla's and Defendant's attorneys attempted to negotiate a licensing agreement that would allow Defendant to use Plaintiff's trademarks for a fee. The negotiations went on until September 2010, at which time Marla herself met with Gallagher to try to finalize an agreement. *See* Pl.'s LR 56.1 Stmt. ¶ 24. The negotiations failed, and the parties did not enter into a licensing agreement. *See id.* ¶ 25.

While the licensing negotiations were taking place, Marla applied to the United States Patent and Trademark Office ("USPTO") to register the word "Sarkis." *See id.* ¶ 43. The USPTO approved the mark on November 9, 2010. *See id.*

Defendant's restaurant continued to operate using the marks at issue, and in early 2012 Gallagher sold Defendant to new owners. *See* Def.'s Stmt. Additional Facts ¶ 32. Also around that time, Marla fired Jaffe and began managing Sarkis Café herself. *See* Pl.'s LR 56.1 Stmt. ¶¶ 44–45.

---

[2] Defendant challenges this statement on the basis that it is a self-serving statement made in an affidavit. Def.'s Resp. LR 56.1 ¶ 14. Yet parties are permitted to present evidence on summary judgment by means of affidavits so long as they do not contradict their deposition testimony. *See Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 n.1 (7th Cir. 2014).

3

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

**Analysis**

**I.     Lanham Act Claims**

The core of Plaintiff's claims relate to the allegedly improper use of its trademarks. In addition to challenging the merits of the Lanham Act claims, Defendant has raised several affirmative defenses and brought a counterclaim seeking to cancel Plaintiff's registration in the trademark "Sarkis." Because Defendant's arguments present a number of threshold issues, the Court will address them first before moving to the merits of Plaintiff's claims.

   **A.     Affirmative Defenses**

Defendant has asserted three defenses to Plaintiff's allegations of trademark infringement. The Lanham Act lists the first two defenses, laches and acquiescence, as equitable principles that are applicable in the trademark context. *See* 15 U.S.C. § 1115(b)(9). Although the

third defense—the doctrine of unclean hands—is not listed in the statute, courts have recognized it as an affirmative defense to claims of trademark infringement. *See* 6 *McCarthy on Trademarks and Unfair Competition* § 34:44 (4th ed. 2015). And while the doctrine of unclean hands can act as a stand-alone defense, it also plays a role in the other two defenses. *See, e.g.*, *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825–26 (7th Cir. 1999) ("A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances.").

The application of all three of Defendant's affirmative defenses is within the discretion of the Court and is not an issue for the jury to decide. *See Hot Wax*, 191 F.3d at 819; *see also* Federal Civil Jury Instructions of the Seventh Circuit 13.5.3 (2008) (stating that laches and acquiescence are issues for the court, not the jury).

### 1. Laches

Defendant first asserts that, because Plaintiff took so long to file this suit for trademark infringement, its claims are barred by the doctrine of laches. *See* Answer at 23–27; *see also Chattanoga Mfg., Inc. v. Nike, Inc.*, 307 F.3d 789, 792 (7th Cir. 2002) ("The doctrine of laches is derived from the maxim that those who sleep on their rights, lose them."). To establish a defense of laches, the defendant must show (1) that the plaintiff had knowledge of the defendant's use of the mark, (2) that the plaintiff inexcusably delayed in bringing suit, and (3) that the defendant would be prejudiced by the delay. *See Chattanoga*, 307 F.3d at 792–93.

As an initial matter, the parties disagree as to the period during which Plaintiff allegedly slept on its rights. Defendant would like to start the clock in May 2009, when Jaffe and Defendant signed a letter referencing a franchise agreement. *See* Def.'s Mem. Opp'n Pl.'s SJ & Supp. Def.'s SJ at 4, ECF No. 190 ("Def.'s Resp."). Plaintiff, on the other hand, argues that the period should start, at the earliest, in September 2010 when the negotiations between the parties for a licensing agreement finally broke down. *See* Pl.'s Reply Mem. Supp. SJ & Opp'n Def.'s SJ

5

at 5, ECF No. 196 ("Pl.'s Reply"); Pl.'s LR 56.1 Stmt. ¶¶ 20–21, 24–25. As the Seventh Circuit has recognized, attempts "to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." *Hot Wax*, 191 F.3d at 823–24. Because Plaintiff engaged in negotiations with Defendant up until September 2010, the Court finds that the applicable period did not begin until September 2010.[3]

Before delving into the applicability of the latches doctrine, the Court must assess Plaintiff's contention that the defense is not available because of Defendant's unclean hands. In particular, Plaintiff argues that, during the two-year window prior to the filing of this suit, Defendant knew it was using Plaintiff's trademarks and was thus intentionally infringing. As Plaintiff correctly points out, "[a] party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances." *Hot Wax*, 191 F.3d at 825. Here, not only was Defendant aware that it was using Plaintiff's trademarks, but the use of those trademarks had been the subject of negotiations for over a year. Defendant's intentional infringement of the marks is best displayed by the fact that, during its negotiations with Jaffe, it sought permission "to use [Plaintiff's] trade names, trademarks, recipes, names of suppliers and

---

[3] Defendant contends that the parties had already entered into a franchise agreement during Defendant's dealings with Jaffe. *See* Def.'s Resp. LR 56.1 ¶¶ 20–21, 24–25. But it is uncontested that the parties were still attempting to negotiate a licensing agreement in September 2010, when the negotiations terminated. *See* Pl.'s LR 56.1 Stmt. ¶¶ 24–25; Def.'s Resp. LR 56.1 ¶¶ 24–25.

In a separately filed motion to strike, Defendant challenges the admissibility of the portions of Marla Cramin's affidavit that support Plaintiff's 56.1 Statement. *See* Def.'s Mot. Strike at 6, ECF No. 188. Paragraphs 21 through 24 of the affidavit contain Marla's description of the licensing negotiation and mentions letters from her lawyer to Defendant's lawyer, which Defendant argues is inadmissible hearsay. *See* Marla Aff. ¶¶ 21–24, Pl.'s LR 56.1 Stmt., Ex. A. But Marla possessed personal knowledge of the negotiations independent of the letters. *See* Marla Dep. 43:5–6, 69:17–71:1, 79:20–83:3, Pl.'s Resp. Mot. Compel, Ex. 2, ECF No. 153. The motion raised other objections. To the extent that the Court relies on evidence challenged therein, those arguments are addressed in this opinion.

other relevant intellectual property." Franchising Agreement, Jaffe Dep., Ex. 2, Def.'s Resp. LR 56.1, Ex. D.

In response, Defendant argues that, rather than showing intentional infringement, the interactions between the parties demonstrate that there was no bad faith in its use of the marks. According to Defendant, "[a]fter the failed negotiations, both parties went their separate ways and presumably both parties benefited from a short period of lingering familiarity and joint publicity." *See* Def.'s Reply Supp. SJ at 3, ECF No. 199 ("Def.'s Sur-reply"). But the Court does not read the situation in the same way. The negotiations of the franchising agreement and then of the licensing agreement demonstrate that Defendant understood the trademarks to belong to Plaintiff. When those negotiations failed, the implication is not that there was a détente that allowed Defendant to continue using the marks. Instead, Defendant should have known that its continued use of the marks constituted infringement of Plaintiff's marks.[4]

Putting aside Defendant's unclean hands, the Court finds that the laches defense is not applicable in this case. First, because the relevant period from September 2010 to the filing of the suit in December 2012—two years and two months—is within the three-year statute of limitations, there is no presumption of laches. *See Chattanoga*, 301 F.3d at 793. Furthermore, "if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great." *Hot Wax*, 191 F.3d at 824 (alterations omitted). Here, Defendant contends it was severely prejudiced because it was induced to continue building its business using Plaintiff's marks. *See* Def.'s Resp. at 7–8. But, given the

---

[4] Granted, license negotiations are not necessarily an acknowledgement of the validity of a party's marks. Defendant could have, for example, thought that a licensing agreement could have been cheaper than challenging the marks in court. But, in this case, Defendant's restaurant began as a potential franchise of Plaintiff's restaurant, and there is nothing in the record to indicate that Defendants challenged the validity of the marks prior to this lawsuit.

relatively short period of time between the termination of the negotiations and the filing of this lawsuit, the Court finds that Defendant has failed to establish a level of prejudice sufficient to warrant dismissal based on laches.

In sum, the Court rejects Defendant's argument that Plaintiff's trademark infringement claim is barred by the doctrine of laches. Defendant cannot appeal to the equitable doctrine when it knowingly infringed on Plaintiff's marks. Even if Defendant did not have unclean hands, the two-year period involved is not so long as to warrant a finding that Plaintiff slept on its rights.

### 2. Acquiescence

Defendant next asserts that the trademark infringement claim is barred by Plaintiff's acquiescence. Whereas laches refers to the negligent failure to protect trademark rights, acquiescence applies when "the trademark owner, by affirmative word or deed, conveys its implied consent to another." 6 *McCarthy on Trademarks* § 31:41; *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 933 (7th Cir. 1984) ("[A]cquiescence is associated with intentional abandonment."). Defendant's contention that Plaintiff acquiesced to the use of the trademarks is based on Jaffe's dealings with Defendant leading up to the opening of Defendant's restaurant. In particular, Defendant points to (1) the franchise agreement that Jaffe drafted; (2) news articles and interviews in which the two restaurants are linked, including an interview of Jaffe himself; and (3) the fact that Jaffe trained Defendant's employees to make Plaintiff's sandwiches. *See* Def.'s Resp. at 9–10.

The deficiency in Defendant's argument lies in the fact that, despite the many steps taken to formalize a franchising agreement, no agreement was ever finalized. The evidence cited by Defendant does not compel a different conclusion. Take, for example, Jaffe's training of Defendant's employees. When Jaffe was asked why he agreed to train the employees, he responded: "Because [Plaintiff and Defendant] were in the process of negotiating the franchise

agreement." Jaffe Dep. 17:13–14, Def.'s Resp. LR 56.1, Ex. H. The same is true of the interview in which Jaffe acknowledges Defendant's restaurant as a Sarkis franchise. *See* Def.'s Stmt. Additional Facts ¶ 27. Given the ongoing negotiations for a franchising agreement, it was in Jaffe's interest to promote Defendant's restaurant.

In the end, the failure by the parties to enter into an actual franchise agreement is fatal to Defendant's acquiescence defense. The agreement drafted by Jaffe was never signed by him or by Plaintiff's sole owner, Marla Cramin. *See* Jaffe Dep. 19:5–9, Def.'s Resp. LR 56.1, Ex. D; Marla Dep. 60:7–10, 61:18.[5] Because the signature line demonstrates the parties intent to make the signatures a condition precedent, the agreement has not been executed. *See Hedlund & Hanley, LLC v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 876 N.E.2d 1, 6 (Ill. App. Ct. 2007) ("Whether a writing constitutes a binding contract, even though it is not signed . . . usually depends upon the intention of the parties.").

It is possible that some of Plaintiff's actions could have supported an acquiescence defense if they had been done outside of the context of an ongoing licensing negotiation. But here, the negotiations cast a shadow over all of Plaintiff's actions. Because the negotiations came to a halt, and no agreement was reached, none of Plaintiff's actions may be taken as an affirmative word or deed conveying to Defendant a right to use the trademarks.[6] Accordingly, the Court denies Defendant's acquiescence defense.

---

[5] The agreement does have a signature above the space labeled "Sarkis Café, Inc." *See* Franchising Agreement. But it is undisputed that neither Jaffe nor Marla signed it, and there is no other suggestion as to who might have signed the agreement.

[6] Defendant tries to salvage the acquiescence defense by arguing that even after the negotiations ended, Plaintiff still kept plaques on its walls mentioning Defendant's restaurant. *See* Def.'s Sur-reply at 7. Putting aside the fact that it is not clear exactly how long these plaques were in Plaintiff's restaurant after negotiations had terminated, the failure to take them down is not sufficient to qualify as an affirmative act conveying Defendant a right to use the trademarks.

### 3. Unclean Hands

Lastly, Defendant argues that Plaintiff's trademark claims are barred by the doctrine of unclean hands. The contentions here are similar to those relating to the acquiescence defense. In short, Defendant states that Jaffe's actions made it so that Plaintiff was partially responsible for creating the confusion at issue in this case. As explained above, Jaffe's actions were performed during the course of the parties' negotiations. Once the negotiations failed to produce an agreement, Defendant knew that it did not have permission to use the trademarks in questions. Accordingly, the Court denies Defendant's unclean hands defense.

### B. Cancellation of Registered Mark

Of the five marks at issue in this case, the only one that has been registered is "Sarkis," which Plaintiff registered with the USPTO in 2010. *See* Pl.'s LR 56.1 Stmt. ¶ 43. In an action involving a registered mark, courts have the power to order the cancellation of registrations. *See* 15 U.S.C. § 1119; *see also Specht v. Google, Inc.*, 747 F.3d 929, 936 (7th Cir. 2014). Defendant's counterclaim seeks cancellation of the registered trademark on three grounds: (1) Plaintiff abandoned the mark, (2) Plaintiff has not used the mark interstate commerce, and (3) Sarkis is a proper name. *See* Answer at 42.

In its motion for summary judgment, Plaintiff contests these three grounds. *See* Pl.'s Mem. Supp. Mot. SJ at 12–13, 14–15, ECF No. 184 ("Pl.'s Mot. SJ"). In response, Defendant relies solely on the third theory—that Sarkis is a proper name. *See* Def.'s Resp. at 25.[7]

Under the Lanham Act, a trademark consisting of a name identifying a particular living individual may not be registered unless the individual consents. *See* 15 U.S.C. § 1052(c); *see*

---

[7] Defendant fails to address Plaintiff's arguments as to the other two grounds for cancellation, and they are waived. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that arguments not presented to the district court in response to summary judgment motions are waived).

*also* § 1064(3) (stating that if a registration was obtained contrary to § 1052(c), cancellation is proper).[8] In response, Plaintiff argues that cancellation based on § 1052(c) must be raised by the party whose name was registered, and thus only Sarkis Tashjian could challenge the registration on this basis. *See* Pl.'s Reply at 20. Although the Seventh Circuit has yet to speak on this issue, numerous other courts, as well as the Trademark Trial and Appeal Board, have held that unrelated third-parties may not seek cancellation based on § 1052(c). *See, e.g.*, *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 990 (8th Cir. 1993), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014); *Capetola v. Orlando*, 426 F. Supp. 616, 617 (E.D. Pa. 1977); *Ceccato v. Manifattura Lane Gaetano Marzotto & Figli S.P.A.*, 32 U.S.P.Q.2d 1192, 1194–95 (T.T.A.B 1994); *see also* 6 *McCarthy on Trademarks* §§ 13:37, 20:54. The basis for the rule is that § 1052(c) is meant to "protect living individuals from the commercial exploitation of their names." *Ceccato*, 32 U.S.P.Q.2d at 1195. The Court finds these holdings persuasive. Because Defendant has no relation to Sarkis Tashjian, it may not rely upon § 1052(c).

The cases cited by Defendant do not require a contrary result. *See* Def.'s Sur-reply at 14. In *Zuppardi's Apizza, Inc. v. Tony Zuppardi's Apizza, LLC*, the court addressed whether a defendant had standing to assert a counterclaim seeking cancellation based on § 1052(c). 2014 WL 4841085, at *3 (D. Conn. 2014). But, there, Robert Zuppardi's own estate was the one seeking cancellation of the mark, so the court did not need to address whether a third-party could

---

[8] Defendant's counterclaim originally stated that "Sarkis" should be cancelled because it is primarily a surname, in which case it would be barred from registration by 15 U.S.C. § 1052(e)(4). *See* Answer at 42. Since then, Defendant has changed the basis for its argument to § 1052(c), noting that "Sarkis" is the first name of Sarkis Tashjian, the original owner of Plaintiff's restaurant.

seek cancellation based on § 1052(c).[9] Defendant's second case fares no better. In *Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc.*, the court held that the mark was not invalid under § 1052(c) because the individual in question had already consented to the registration—an exception that is spelled out in the statute. 576 F. Supp. 2d 868, 880 (N.D. Ill. 2008). The opinion makes no mention of whether the defendant was the proper party to seek cancellation.

Accordingly, the Court grants Plaintiff's motion for summary judgment as to Defendant's counterclaim seeking cancellation of the "Sarkis" trademark.

### C. Trademark Infringement

Moving to Plaintiff's Lanham Act claims, Plaintiff alleges that Defendant's uses of its trademarks constitute false designation of origin in violation of 15 U.S.C. § 1125(a) (Count I) and trademark infringement and unfair competition in violation of 15 U.S.C. § 1114 (Count II). *See* 2d Am. Compl. at 7–11, ECF No. 47. To prevail on either claim, Plaintiff must show that (1) the marks at issue are protectable and (2) Defendant's use of the marks is likely to create confusion among consumers. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001); *see also H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759 (7th Cir. 2007).

---

[9] In *Ceccato*, the Trademark Trial and Appeal Board explained the difference between the standing question and the issue of who may bring a challenge under § 1052(c). 32 U.S.P.Q.2d at 1095. The challenger in that case had standing by virtue as its position as defendant. *Id.* at 1095 n.7. But, despite having standing, the party had no relationship to the individual whose name was being used, and thus could not assert his rights. *Id.* at 1095–96. The Board noted that the two questions are separate and thought it best not to characterize the latter issue as one of standing. *Id.* at 1095.

1.  **Protectable Mark**

Marks are classified into five categories: generic, descriptive, suggestive, arbitrary, and fanciful. *See Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). If a mark is descriptive, it is protectable only if it has acquired secondary meaning. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 988–89 (7th Cir. 2004) (noting that personal names are a subset of descriptive marks in that they are not protectable without proof of secondary meaning). In other words, for a descriptive mark to be protectable it must "denote a single brand, not the entire product, so that its use by other sellers of the product would confuse consumers about the source of what they were buying." *Id.*

In addition to the registered mark "Sarkis," Plaintiff maintains that it has trademarks in the names of its sandwiches—the "Loretta," the "Disaster," and the "Animal"—as well as its logo. *See* Pl.'s Mem. Supp. Mot. SJ at 5.[10] The names "Disaster" and "Animal" are arbitrary marks as applied to sandwiches. *Cf. Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611 n.2 (7th Cir. 1965) (explaining that an arbitrary mark "is a work in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service").[11] Accordingly, these marks are protectable without proof of secondary meaning. *See Custom Vehicles*, 476 F.3d at 484.

---

[10] At times, Plaintiff mentions a fourth sandwich, the Special Grilled Cheese. *See* Pl.'s Reply Supp. Mot. SJ & Resp. Def.'s Mot SJ at 10, ECF No. 196. But Plaintiff did not include the sandwich in its complaint or in its brief for summary judgment. Accordingly, the Court will not consider it as part of the Lanham Act claims.

[11] Even if the name "Animal" could be considered suggestive—because it points to the fact that the sandwich has meat as an ingredient—the result is the same. Suggestive marks require no proof of secondary meaning to be protectable. *See Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.3d 434, 443 (7th Cir. 1990).

13

The classification of "Sarkis" and "Loretta" requires a little more work. As the Seventh Circuit explained in *Peaceable Planet*, personal names are typically classified as descriptive marks. 362 F.3d at 988–89. But the reluctance to allow personal names (as opposed to purely descriptive words) to be used as trademarks stems from three unique concerns. First, allowing trademark protection for personal names could foreclose another individual with the same name from using the name in her business. *See id.* at 989. Second, some names such as "Smith" or "Jones" are so common that customers will not assume that two products with the same name come from the same source. *See id.* Third, allowing protection for a name could prevent another person from using her name as a mark, thereby depriving consumers of useful information regarding that individual's products or services. *See id.* at 989–90. These three rationales must be kept in mind when determining the protectability of names as marks. *See, e.g.*, *id.* at 990 (holding that the name "Niles" for a toy was protectable because none of the reasons for excluding personal names was applicable).

As an initial matter, neither side disputes that "Loretta" and "Sarkis" are personal names. Sarkis, which is a registered mark, carries with it a presumption that the trademark is not merely descriptive. *See Packman*, 267 F.3d at 638.[12] But because it is undisputed that "Sarkis" is a proper name, the presumption falls away. *See* Pl.'s LR 56.1 Stmt. ¶ 4 (stating that the original owner was named Sarkis Tashjian); *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 172

---

[12] Under the Lanham Act, registration of a mark "affords a plaintiff one of two presumptions: (1) that her registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning." *Packman*, 267 F.3d at 638; *see also* 15 U.S.C. § 1115(a). Because the USPTO did not require any proof of secondary meaning during the registration process of "Sarkis," it appears that the USPTO considered "Sarkis" not merely descriptive. *See* United States Patent and Trademark Office, Registration No. 3872829, http://tsdr.uspto.gov/#caseNumber=77968293&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Feb. 9, 2016); *see also Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 904 (N.D. Ill. 2014) (holding that courts may take judicial notice of official records of the United States Patent and Trademark Office).

(7th Cir. 1996) ("The presumption of validity that federal registration confers . . . evaporates as soon as evidence of invalidity is presented.").[13] Nor does Plaintiff dispute that "Loretta" is a proper name. *See* Pl.'s Mot. SJ at 5–6.

Furthermore, when analyzed against the rubric set forth in *Peaceable Planet*, it is clear that use of "Sarkis" and "Loretta" in this case weigh against their protectability, absent a showing of secondary meaning. For example, conferring trademark protection on the use of "Sarkis" for restaurants would prevent another individual with the same name from opening a café and naming it after himself. Plaintiff respond that Sarkis is not a common name, but fails to cite any evidentiary support for this proposition.[14] The use of "Loretta" for food products raises similar concerns. Accordingly, the Court finds that the marks "Sarkis" and "Loretta" are protectable only if they have acquired secondary meaning.

Secondary meaning "refers to the manner in which a consumer identifies a specific business or a business's reputation by a particular trademark." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 728 (7th Cir. 1998). To determine whether a mark has acquired secondary meaning, courts consider direct evidence (such as direct consumer testimony and consumer surveys) and circumstantial evidence (such as exclusivity, length, and manner of use; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying). *See Echo Travel, Inc. v. Travel Assocs.,*

---

[13] Although the Lanham Act prevents registration of marks that are "primarily merely a surname," 15 U.S.C. § 1052(e)(4), the rule also has been applied to first names. *See Peaceable Planet*, 362 F.3d at 990 (noting that the extension to first names is a judicial innovation); 6 *McCarthy on Trademarks* § 13:2.

[14] Indeed, a quick internet search indicates that the name "Sarkis" cannot be that uncommon given that there is a "Saint Sarkis" and the Armenian Apostolic Church celebrates the Feast of St. Sarkis. And, although the results of the Court's own internet search may not constitute evidence, it demonstrates the need for Plaintiff to present some evidentiary support of its claim.

*Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989). The existence of secondary meaning is a question of fact. *See Platinum Home Mortg. Corp.*, 149 F.3d at 728.

This case contains very strong evidence that "Sarkis" and "Loretta" obtained secondary meaning. Both marks have been used for nearly 50 years by Plaintiff. *See* Pl.'s LR 56.1 Stmt. ¶ 4 (noting that Sarkis Café was established in 1965 and started serving the Loretta sandwich shortly after). Perhaps even more persuasive is the undisputed fact that Defendant sought to enter into a licensing agreement with Plaintiff to use these marks for its own restaurant.

That said, Defendant has presented evidence, however slight, to contradict Plaintiff's claim of secondary meaning. To establish secondary meaning, Plaintiff offers (1) news articles talking about Defendant's restaurant as the "city outpost" of Plaintiff's restaurant, (2) reviews from Yelp and GrubHub in which consumers presume that Defendant's restaurant is associated with Plaintiff's, and (3) statements from Marla, Plaintiff's owner, in which she states that customers asked her whether she had opened a second restaurant. *See* Pl.'s LR 56.1 Stmt. ¶¶ 32–36.[15] As Defendant points out, however, when the parties were negotiating a possible franchising agreement and, later, a licensing agreement, news articles reported that the restaurants were related. *See* WGN9 News Article; Marla Aff. ¶41, Ex. 23, Pl.'s LR 56.1 Stmt., Ex. A. In fact, one of the articles Plaintiff cites is from August 2009, when the parties were still hoping to enter into a licensing agreement. *See id.* Taking this evidence in the light most favorable to Defendant, it is possible that any consumer confusion was a result of the news coverage during the time that the

---

[15] In its motion to strike, Defendant argues that this evidence of actual confusion, which is all supported by Marla's affidavit, is inadmissible hearsay. *See* Def.'s Mot. Strike at 6–8. The allegedly inadmissible statements, however, are not offered for the truth of the matter asserted. Take, for example, the yelp review that states: "Ironically enough, in my opinion, this is actually slightly better than the original." Yelp Reviews at 2; Marla Aff. ¶42, Ex. 24, Pl.'s LR 56.1 Stmt., Ex. A. Plaintiff is not trying to use this review to prove that one restaurant is better than the other, but to show that customers are indeed confused as to the source. *See Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 2013 WL 6839815, at *7 (N.D. Ill. 2013).

parties were trying to negotiate a franchise agreement, rather than from any secondary meaning acquired by the marks. Accordingly, although the weight of the evidence may be substantially in Plaintiff's favor, the actual weighing must be left to the jury.

In addition, at times Plaintiff has asserted it has a trademark in its logo. *See, e.g.*, 2d Am. Compl. ¶ 12; Pl.'s Mot. SJ at 5 ("Sarkis has a trade or service mark in its name, Sarkis, its unique sandwich names, Loretta, Disaster and Animal and its logo."). Yet at no point does Plaintiff make any arguments regarding the classification of the logo in terms of descriptiveness or why it is a protectable mark. Accordingly, the Court holds that Plaintiff has waived its claims that it has a protectable mark in its logo. *See Palmer*, 327 F.3d at 597.

### 2. Likelihood of Confusion

Assuming that Plaintiff is able to establish at trial that "Animal" and "Disaster" are protectable trademarks, Plaintiff also must show that Defendant's uses of the marks are likely to create confusion among consumers. Courts analyze seven factors to determine whether consumers are likely to be confused:

(1) the similarity between the marks in appearance and suggestion;

(2) the similarity of the products;

(3) the area and manner of concurrent use;

(4) the degree and care likely to be exercised by consumers;

(5) the strength of the plaintiff's mark;

(6) any actual confusion; and

(7) the intent of the defendant to "palm off" his product as that of another.

*AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Although no single factor is dispositive, courts are free to assign varying weights to each factor depending on the facts

17

presented. *Id.* In most cases, the three most important factors are the similarity of the marks, the defendant's intent, and actual confusion. *Id.*

Some of the factors in this analysis weigh heavily in favor of finding a likelihood of confusion. For example, there is very strong evidence that Defendant intended to use Plaintiff's marks to profit on the confusion. The negotiations demonstrate that Defendant wanted to be able to use Plaintiff's marks. *See* Franchising Agreement, Jaffe Dep., Ex. 2, Def.'s Resp. LR 56.1, Ex. D (stating that, if the agreement was entered into, Defendant would be allowed to use Plaintiff's "trade names, trademarks, recipes, names of suppliers and other relevant intellectual property"). Even once the franchise negotiations stalled, the parties attempted to reach an agreement by which Defendant could license the use of Plaintiff's trademarks. *See* Gallagher Dep. at 18:16–24. Defendant's decision to use the marks even after discussions broke down indicates that it hoped to profit from the unauthorized use of the marks. *See Tisch Hotels*, 350 F.2d at 613.

On the other hand, when the factual records is construed in Defendant's favor, there is some evidence to the contrary. For example, a reasonable juror could find that, given the distance between the restaurants—Plaintiff's is in Evanston while Defendant's is in the city—the marks were not used in the same geographic area. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000) (finding that the district court committed clear error in weighing this factor in favor of the plaintiff when the parties' restaurants were 1.4 miles apart). Furthermore, as discussed above, a jury could find that the confusion (to the extent any existed) was caused by the news reports recounting the business negotiations between the parties, some of which claimed that the two restaurants were in fact related, rather than from the use of the marks themselves. *See* WGN9 News Article; Marla Aff. ¶41, Ex. 23, Pl.'s LR 56.1 Stmt., Ex. A.

Given that finding a likelihood of confusion is a highly factual determination, courts should be cautious about deciding the issue on summary judgment. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993). Thus, despite the substantial evidence in Plaintiff's favor, the Court finds that the evidence is not so one-sided as to warrant summary judgment for Plaintiff.

## II. State Law Claims

In addition to the claims based on the Lanham Act, Plaintiff's complaint also contains three state law claims: common law unfair competition (Count IV), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V), and violation of the Illinois Uniform Deceptive Trade Practices Act (Count VI). In its motion for summary judgment, Defendant argues that Count V should be dismissed because Plaintiff has not presented evidence of actual damages. *See* Def.'s Resp. at 23–24. Similarly, Defendant contends that relief under Count VI is limited to injunctive relief. *See id.* at 24. Plaintiff does not respond to either of these arguments in its briefing and, thus, has waived any argument to the contrary. *See Palmer*, 327 F.3d at 597–98. The Court grants Defendant's motion for summary judgment as to Count V and limits the relief Plaintiff may seek under Count VI to injunctive relief.

## Conclusion

For the reasons stated herein, the Court denies in part and grants in part Plaintiff's motion [183] and denies in part and grants in part Defendant's motion [190]. Plaintiff's motion is granted as to the affirmative defenses and Defendant's counterclaim. The motion is denied as to the merits of the Lanham Act claims. Defendant's motion is granted as to the state law claims and denied in all other respects. To the extent that Defendant's motion to strike [188] is not moot, it is denied.


**IT IS SO ORDERED.**          **ENTERED: 2/24/16**

_/s/ John Z. Lee_

**John Z. Lee**
**United States District Judge**